1

2

3

4              UNITED STATES DISTRICT COURT

5            NORTHERN DISTRICT OF CALIFORNIA

6

7    MICHAEL L. RHINEHART,                    Case No.  11-cv-00812-JST (PR)

            Plaintiff,
8                                             **ORDER GRANTING IN PART AND**
        v.                                    **DENYING DEFENDANTS' MOTION**
9                                             **FOR SUMMARY JUDGMENT;**
                                              **STAYING ACTION AND REFERRING**
10   MATTHEW CATE, et al.,                    **TO SETTLEMENT PROCEEDINGS;**
                                              **DIRECTIONS TO CLERK**
            Defendants.
11                                            Re: Dkt. Nos. 68, 87

12

13

            Michael L. Rhinehart ("Rhinehart"), a state prisoner, filed a pro se prisoner complaint
14
     under 42 U.S.C. § 1983.  Rhinehart claims that defendant California Department of Correctional
15
     and Rehabilitations Secretary Matthew Cate ("Cate"), former Warden of Salinas Valley State
16
     Prison ("SVSP") A. Hedgpeth ("Hedgpeth"), and former Warden of Kern Valley State Prison
17
     ("KVSP") K. Harrington ("Harrington") violated Rhinehart's Fourteenth Amendment right to
18
     equal protection and Eighth Amendment right to the basic necessities of life, i.e., outdoor exercise.
19
     Rhinehart has filed an opposition, and defendants have filed a reply.  Rhinehart then filed a
20
     response to defendants' reply.[1]  Having carefully considered the papers submitted, for the reasons
21
     stated below, defendants' motion for summary judgment is GRANTED in part and DENIED in
22
     part.
23

24

25

─────────────────────
26  [1] Five months after Rhinehart filed an unauthorized response to defendants' reply, Rhinehart filed
    three supplementary exhibits (dkt. nos. 84, 85) in support of his opposition to defendants' motion
27  for summary judgment.  Defendants have filed a motion to strike these exhibits.  Rhinehart has
    filed an opposition, and defendants have filed a reply.  The Court finds that Rhinehart's
28  submission of supplemental exhibits do not comply with Civil Local Rules 7-3(d).  Accordingly,
    defendants' motion to strike these exhibits is GRANTED.

**FACTUAL BACKGROUND**

The following facts are viewed in the light most favorable to plaintiff.

**I.     Modified Programming**

At KVSP and SVSP, evidence of inmate violence or potential violence sometimes requires the restriction of inmate privileges at the prison for the security and safety of both inmates and staff.  (Decl. Wood ¶ 8; Decl. Hatton ¶ 4.)  Prison officials may determine that, depending on the incident, certain factions of inmates, or a particular housing unit may be placed on lockdown or a "modified program."[2]  (Decl. Wood ¶ 8; Decl. Hatton ¶ 4.)  Each time a modified program is implemented, a "Program Status Report" ("PSR") is prepared regarding the circumstances surrounding the creation of the modified program, and the release process.  (Decl. Wood ¶ 9; Decl. Hatton ¶ 5.)  All modified programs must be approved by the Warden.  (Decl. Wood ¶ 9; Decl. Hatton ¶ 5.)  During a modified program, the affected inmates' privileges to outdoor exercise, visitations, quarterly packages, and canteen may be limited or suspended.  (Decl. Wood ¶ 11.) The modified program remains in effect until all searches, investigations, and interviews have been completed and restoration of inmate privileges generally occur as soon as it is reasonably safe to do so.  (Id.)  Once a modified program is implemented, the facility must do the following before returning to normal programming:  (1) stop the violence from continuing by suspending exercise-yard and dayroom privileges; (2) prevent violence from spreading within the facility or to

---

[2] "Modified Program means the suspension or restriction of inmate program activities and/or movement that impacts less than all programs or less than all inmates.  A Modified Program may either occur independently in response to an incident or unusual occurrence or may occur as a facility transitions from a lockdown to regular programming.  Imposed restrictions may fluctuate as circumstances dictate with the goal of resuming regular programming as soon as it is practical. Modified programming will last no longer than necessary to restore institutional safety and security or to investigate the triggering event, and shall not target a specific racial or ethnic group unless it is necessary and narrowly tailored to further a compelling government interest.  For those inmates whose movement has been restricted, movement may be authorized on a case-by-case basis for essential or emergency services such as medical, dental, mental health or law library visits.  The routine and/or temporary restrictions on inmate movement or yard activities, which do not last longer than 24 hours, are not considered a program modification."  Cal. Code Regs., tit. 15, § 3000.

2

other facilities and beyond; (3) disrupt inmates' ability to commit further violence by conducting intensive searches to remove weapons; (4) gather information to determine how to safely restore privileges; and (5) encourage nonviolence among inmates through the Inmate Advisory Council. (Id. ¶¶ 12-16.)  Usually, privileges are restored incrementally, with dayroom and exercise yard privileges normally being the last privileges to be restored because they pose the greatest potential for inmate violence.  (Id. ¶ 17.)

## II.    **Rhinehart's Prison History**

Rhinehart's prison file shows that between 1995 and 2002, Rhinehart was validated as a member of the Black Guerilla Family prison gang.  (Decl. Wood ¶ 3; Decl. Hatton ¶ 3.) Rhinehart's prison file also showed that Rhinehart had been previously involved in unspecified exercise-yard violence, and in 2006, Rhinehart was housed in administrative segregation following another inmate's attack on him in the exercise yard.[3]  (Decl. Wood ¶ 3; Decl. Hatton ¶ 3.) Rhinehart's current gang membership is classified as "inactive."  (Decl. Wood ¶ 3; Decl. Hatton ¶ 3.)

## III.   **Rhinehart's challenged modified programming at KVSP**

Rhinehart asserts that from May 26, 2009, through June 28, 2009, and then again, from May 17, 2010, through July 8, 2010, when Rhinehart was transferred to SVSP, Rhinehart was placed on a modified program at KVSP even though he was not involved in any of the preceding disturbances.  (Opp. at 2-3; Decl. Wood ¶ 24.)  While at KVSP, Rhinehart was housed in Facility D.  Rhinehart claims that, during these times, only black inmates were placed on the modified program, which took away all privileges, such as family visits, receiving packages, use of the day room, and going outdoors for exercise.  (Opp. at 2.)  Non-black inmates were not restricted.  (Id.)

According to the PSR at KVSP, on May 20, 2009, a black inmate attacked an officer without any apparent provocation, and did not cease until the officer pepper-sprayed him.  (Decl. Wood ¶ 23.)  On May 26, 2009, another black inmate punched an officer in the face, knocking the

---

[3]   The Court notes that it is unclear whether Rhinehart's 2006 exercise yard incident is the same as Rhinehart's unspecified earlier exercise yard incident.

United States District Court
Northern District of California

officer unconscious, in an apparent unprovoked attack.  (Id.)  That same inmate also attacked the officers who were escorting him from his cell.  (Id.)  As a result of those two attacks, prison officials believed it necessary to place all black inmates in Facility D – the facility where Rhinehart was housed – on a modified program until prison officials could complete an investigation into the reason for the attacks, and be reasonably sure that additional attacks were unlikely.  (Id. and Ex. A.)  By June 28, 2009, all Facility D black inmates had their privileges restored.  (Id. ¶ 24 and Ex. A at AGO00004.)

Between May 2009 and May 2010, there were several more instances of modified programming.  (Decl. Wood ¶¶ 25-30.)  According to the PSR, at KVSP, on May 27, 2010, a black inmate stabbed another black inmate in the head and neck at Facility D's library.  (Id. ¶ 31.)  Both members were high-ranking members of the Inmate Advisory Council.  (Id.)  The attacker was a member of a street gang called the "Bloods," and the victim was a member of a street gang called the "Crips."  (Id.)  Both gangs predominantly have members who are black.  (Id.)  Most of Facility D's black inmates are associates with either the Crips or the Bloods.  (Id. ¶ 21.)  As a result, prison officials placed all of Facility D's black inmates on a modified program.  (Id. ¶ 31 and Ex. A at AGO00012.)

## IV.    Rhinehart's modified programming at SVSP

On July 8, 2010, Rhinehart was transferred from KVSP to SVSP.  (Opp. at 3.)  Upon his arrival at SVSP, Rhinehart was placed on a modified program in Facility B.  (Id.)  Rhinehart claims that Hedgpeth ordered Rhinehart to be placed on a modified program on the basis that Rhinehart is black, despite the fact that Rhinehart was not involved in any incident.  (Compl. at 4.)  As a result of the modified programming, at the time Rhinehart initiated this federal action on October 10, 2011, Rhinehart was still prohibited from outdoor exercise.  (Id. at 4.)

Prior to Rhinehart's arrival at SVSP, on May 27, 2010, a large riot between Northern Hispanic inmates and black inmates occurred on Facility C's exercise yard.  (Decl. Hatton ¶ 7.)  Both Northern Hispanic inmates and black inmates were placed on a modified program.  (Id.)  This riot sparked a prison-wide war between the two groups.  (Id.)  On June 22, 2010, Facility B

4

1   inmates concluded an unrelated modified program that had suspended exercise yard privileges.

2   (Id. ¶ 8.)  The following day, on June 23, 2010, as soon as exercise yard privileges were restored, a

3   riot involving weapons occurred between black inmates and Northern Hispanic inmates on

4   Facility B's exercise yard.  (Id.)  A total of 26 inmates participated, including black inmates

5   belonging to different gangs.  (Id.)  As a result, all Facility B inmates were placed on a modified

6   program.  (Id. and Ex. A at AGO00038.)  The following day, Facility E's Northern Hispanic

7   inmates and black inmates rioted on the exercise yard.  (Decl. Hatton ¶ 9.)  On June 29, 2010, two

8   black inmates attacked another black inmate in Facility B's medical clinic for not participating in

9   the June 23, 2010 riot.  (Id. ¶ 10.)  Prison officials believed that black inmates were using violence

10  to coerce other black inmates to participate in the ongoing racial conflict.  (Id.)  Between June 30,

11  2010, and July 13, 2010, officers recovered two inmate notes within Facility B indicating that

12  there was ongoing hostility between the black inmates and the Northern Hispanic inmates.  (Id. ¶

13  11.)  On July 14, 2010, officers received further information that intimated the violence would

14  continue, and that the Northern Hispanic inmates were under orders to attack black inmates on

15  sight.  (Id. ¶ 13.)  Based on that information, the modified program was modified to be limited

16  only to black inmates and Northern Hispanic inmates.  (Id.)  Between July 21, 2010, and July 28,

17  2010, officers continued to receive information that the Northern Hispanic inmates were preparing

18  for more violence toward black inmates.  (Id. ¶ 15.)  On August 10, 2010, officers found an inmate

19  note that the May 27, 2010, riot between the Northern Hispanic inmates and the black inmates was

20  instigated by the "Hoover Crips," and that the black inmate population would defend the Hoover

21  Crips if attacked by the Northern Hispanics.  (Id. ¶ 16.)  Based on this information, prison officials

22  believed that gang and non-gang affiliated black inmates were expected to participate in the racial

23  conflict with the Northern Hispanic inmates.  (Id.)  By August 31, 2010, the racial feud appeared

24  to have been resolved, and on September 8, 2010, prison officials began an incremental release of

25  two black inmates and two Northern Hispanic inmates, who were carefully selected as being the

26  least likely to engage in violence, to the exercise yard on Facility B.  (Id. ¶¶ 18-19.)  Immediately

27  upon release, the inmates began attacking each other.  (Id. ¶ 19.)  As a result, the incremental

28

United States District Court
Northern District of California

release was suspended and officials continued their investigation.  (Id.)  On October 4, 2010, prison officials found a secret gang message directing all Northern Hispanic inmates to use weapons to attack any black inmates on sight.  (Id. ¶ 20.)  Throughout most of October 2010, prison officials continued to find evidence that the Northern Hispanic inmates still planned to perpetrate violence against black inmates, and the black inmates still intended to attack any Northern Hispanic inmates.  (Id. ¶¶ 21-23.)  On October 28, 2010, another attempt at incremental release failed, with two Northern Hispanic inmates immediately attacking two black inmates upon release into the exercise yard.  (Id. ¶ 26.)  On November 3, 2010, all of Facility B's black inmates were returned to a normal program while Northern Hispanic inmates remained on a modified program because all factors indicated that Northern Hispanic inmates would continue to engage in violence toward black inmates if they were released together.  (Id. ¶ 27.)

## DISCUSSION

### I.      Motion for Summary Judgment

#### A.      Legal Standard

Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See id.

A court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the initial

burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  Id.  The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  See id. at 324 (citing Fed. R. Civ. P. 56(e) (amended 2010)).

For purposes of summary judgment, the court must view the evidence in the light most favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party.  See Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999).  The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  See T.W. Elec. Serv., Inc., v. Pacific Elec. Contractors Ass'n., 809 F.2d 626, 630 (9th Cir. 1987).

**B.     Analysis**

Defendants move for summary judgment.  They argue first that Cate is entitled to summary judgment because there is no dispute that he did not control implementation of the modified programs in individual institutions.  Second, they argue that they are entitled to summary judgment because the modified programs were narrowly tailored to further prison safety and security, and thus, did not violate Rhinehart's right to equal protection as a matter of law.  Third, they argue that they are entitled to summary judgment because Rhinehart's deprivation of outdoor exercise during the periods of his modified programming did not violate the Eighth Amendment as a matter of law.  Further, defendants argue that they are entitled to qualified immunity as to both claims.  Finally, defendants argue that Rhinehart's request for injunctive relief is moot.  The Court addresses each argument in turn.

1.  <u>Defendant Cate</u>

"In a § 1983 or a <u>Bivens</u> action – where masters do not answer for the torts of their servants – the term 'supervisory liability' is a misnomer.  Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 677 (2009) (finding under <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007), and Rule 8 of the Federal Rules of Civil Procedure, that complainant-detainee in a <u>Bivens</u> action failed to plead sufficient facts "plausibly showing" that top federal officials "purposely adopted a policy of classifying post-September-11 detainees as 'of high interest' because of their race, religion, or national origin" over more likely and non-discriminatory explanations).  A plaintiff must also show that the supervisor had the requisite state of mind to establish liability, which turns on the requirement of the particular claim — and, more specifically, on the state of mind required by the particular claim — not on a generally applicable concept of supervisory liability.  <u>Oregon State University Student Alliance v. Ray</u>, 699 F.3d 1053, 1071 (9th Cir. 2012).  Knowing acquiescence is insufficient to establish a supervisor's liability for constitutional torts that require specific intent, such as the claims of invidious racial discrimination at issue in <u>Iqbal</u>.  <u>Id.</u>, citing <u>Iqbal</u>, 556 U.S. at 676-77.  In such cases, the supervisor must act with the purpose of violating the plaintiff's constitutional rights.  <u>Id.</u>

Defendants provide evidence that Cate had no involvement in the decision-making process of the modified programs at either KVSP or SVSP at the challenged times.  (Decl. Wood ¶ 20; Decl. Hatton ¶ 5.)  Rhinehart has not provided any reliable evidence to the contrary.  Moreover, even assuming that Cate was aware of the challenged modified programming, Rhinehart provides no evidence that Cate acted with the specific intent to discriminate against black inmates in violation of the Equal Protection Clause.  <u>See</u> <u>Oregon State University Student Alliance</u>, 699 F.3d at 1071; <u>Iqbal</u>, 556 U.S. at 677 ("to state a claim based on a violation of a clearly established right,

[a plaintiff] must plead sufficient factual matter to show that [defendants] adopted and implemented the detention policies at issue not for a neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national origin.").  Thus, for purposes of Rhinehart's equal protection claim, Cate is entitled to summary judgment.

With regard to Rhinehart's Eighth Amendment claim, however, Rhinehart asserts that Cate knowingly acquiesced to the policy of withholding outdoor exercise from inmates for long periods of time.  However, Rhinehart's assertions are similar to the bald and conclusory assertions rejected as insufficient in Iqbal.  Id. at 680-81 ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.").  A supervisor may be liable under section 1983 upon a showing of (1) personal involvement in the constitutional deprivation or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.  Henry A. v. Willden, 678 F.3d 991, 1003-04 (9th Cir. 2012).  There is no reliable evidence that Cate even knowingly acquiesced in the policy of depriving inmates of outdoor exercise, much less that he was personally involved.  Rhinehart submits as evidence an unauthenticated letter dated July 14, 2010, from the Prison Law Office to Cate.  (Opp, Ex. H.)  However, the letter discusses the problem of race-based modified programming in California prisons; it does not discuss any policy regarding the deprivation of outdoor exercise.  Thus, there is an absence of disputed fact that Cate knowingly acquiesced in such a policy, and Cate is entitled to summary judgment as a matter of law.

2.   Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985) (quoting Plyler v. Doe, 457 U.S. 202, 216 (1982)).  Strict

scrutiny is the standard to test the infringement of prisoners' constitutional rights based on the right to racial equality.   Johnson v. California, 543 U.S. 499, 530-31 (2005).  In an equal protection claim based on racial discrimination, "the defendants ha[ve] to show that reasonable men and women could not differ regarding the necessity of a racial classification in response to prison disturbances and that the racial classification was the least restrictive alternative (i.e., that any race-based policies are narrowly tailored to legitimate prison goals)."  Richardson v. Runnels, 594 F.3d 666, 671 (9th Cir. 2010).

a.   KVSP

Here, the undisputed evidence shows that KVSP placed Rhinehart and all other black inmates in Facility D on modified programming between May 26, 2009, and June 28, 2009 (Decl. Wood ¶¶ 23-24), and again from May 27, 2010, through July 8, 2010 (Id. ¶ 31), the date that Rhinehart was transferred to SVSP .  The modified programming was instituted because of incidents involving individual black inmates in Facility D.  (Id. ¶¶ 23, 24, 31.)  Specifically, on May 20, 2009, a black inmate attacked an officer without provocation, and on May 26, 2009, another black inmate punched an officer in the face without provocation.  (Id. ¶ 23.)  As a result, modified programming was instituted for all black inmates on Facility D.  (Id. ¶ 23.)  Other incidents of violence occurred between July 2009 and June 2010.  (Id. ¶¶ 25-30.)  Then, on May 27, 2010, a Blood gang member attacked a Crip gang member in Facility D's library, which resulted in an order for modified programming for all black inmates in Facility D.  (Id. ¶ 31.) Rhinehart alleges that he did not engage in any acts of violence, and was placed on modified programming solely on the basis of his race.

Defendants may succeed on summary judgment only if the undisputed evidence shows that the decision to place Rhinehart on modified programming was a "narrowly tailored measure[] that further[ed] compelling governmental interests."  Johnson, 543 U.S. at 505.  It is undisputed that

prison security is a compelling governmental interest.  Greene v. Solano County Jail, 513 F.3d 982, 988 (9th Cir. 2008).  The record further supports defendants' argument that the challenged actions were directed toward promoting prison security.

However, the record is not as clear regarding whether the actions of placing individual inmates, based on race, on modified programming was "narrowly tailored" to promote prison security.  No *per se* rule governs whether a prison's policy of temporary racial segregation is narrowly tailored to security purposes; rather, narrow tailoring must be assessed on a case by case basis.  See Johnson, 543 U.S. at 415 ("Strict scrutiny does not preclude the ability of prison officials to address the compelling interest in prison safety.  Prison administrators, however, will have to demonstrate that any race-based policies are narrowly tailored to that end.").  However, the Supreme Court has suggested that actions by prison officials that discriminate because of racial identity alone can be justified only by "a social emergency rising to the level of imminent danger to life and limb – for example, a prison race riot, requiring temporary segregation of inmates."  Id. at 512-13.

The United States Court of Appeals for the Ninth Circuit's decision in Richardson v. Runnels, 594 F.3d 666 (9th Cir. 2010), is informative.  In Richardson, as in this case, the plaintiff was a black inmate in a state prison that appeared to suffer from severe racial violence.  Id. at 668-69.  He sued the prison administrators, alleging that they had violated his right to equal protection by repeatedly placing him, along with the entire black inmate population in one facility, on lockdown following certain incidents of violence by a subset of those inmates.  Id. at 669-70.  There, as here, the plaintiff was not himself affiliated with any of the disruptive groups.  Id. at 670.  The Ninth Circuit reversed the district court's grant of summary judgment, stating that the defendants "made no evidentiary showing at all concerning the basis for regarding all African-Americans as a security risk when one or a few African-American inmates are responsible for an

assault." <u>Id.</u> at 671-72.

Defendants cite to <u>Larry v. Tilton</u>, No. 09-950 JLS (WVG), 2012 WL 4501396 (S.D. Cal. 2011), and <u>Hurd v. Garcia</u>, 454 F. Supp. 2d 1032 (S.D. Cal. 2006), <u>rev'd on other</u> grounds, 471 Fed. Appx. 798 (9th Cir. 2012), in support of summary judgment. However, both cases are distinguishable. In <u>Larry</u>, the district court granted summary judgment to defendants on plaintiff's claim that the prison's modified programming violated plaintiff's right to equal protection. In that case, five black inmates attacked two correctional officers, in an attempt to kill them. <u>Larry</u>, 2012 WL 4501396, *11. The prison locked down all inmates of all races in that facility. <u>Id.</u> Further investigation revealed that the attack was because black inmates were generally discontented with officers and had coordinated and pre-planned an attack. <u>Id.</u> Prison officials discovered that even black inmates who were not directly involved in the attack were harboring heightened ill-will toward prison officials. <u>Id.</u> at *12. Further, the defendants established an "Unlock List" to identify those inmates who were individually determined not to pose an immediate threat to staff, and allowed prison officials to gradually release individual inmates rather than categorically lock them all down. <u>Id.</u> at *12. Thus, in <u>Larry</u>, the defendants produced evidence demonstrating that their approach was narrowly tailored to maintaining prison security based on the facts before them.

In <u>Hurd</u>, the prison locked down all African-American inmates and all Caucasian inmates based on a series of events. 454 F.3d at 1052-53. First, twenty African-American and Caucasian inmates caused a racial riot. <u>Id.</u> at 1052. As a result, the entire facility was placed on modified programming. <u>Id.</u> A week and a half later, all races except for African-Americans and Caucasians were returned to normal programming. <u>Id.</u> Prison officials had evidence that the conflict was between African-American and Caucasian inmates only, and focused on returning them to normal programming. <u>Id.</u> at 1052-53. Thus, the defendants in <u>Hurd</u> produced undisputed evidence

supporting the conclusion that defendants' approach was narrowly tailored to maintaining prison security based on the facts before them.

Here, summary judgment is not warranted, because defendants' response to the institutional violence was not indisputably narrowly tailored.  Rhinehart has been unaffiliated with any gang or disruptive group at the prison since 2002, and Defendants present no evidence that Rhinehart instigated a violent incident.  (Decl. Wood ¶ 3.)  Defendants have reasoned that it was nonetheless necessary to place all black inmates on modified programming during those challenged times because often, when "inmates attack officers for no apparent reason, they are likely carrying out orders from an inmate group or gang."  (Id. ¶ 23.)  They reason further that inmates of different races rarely act together to commit violence against staff.  (Id.)  Finally, they argue that it is often difficult for prison officials to accurately identify which inmates associate with which gang, if any.  (Id. ¶ 6.)  Viewing all the inferences in Rhinehart's favor, however, the Court cannot say that defendants' conclusions are indisputably supported by the record.  Statements that prison officials concluded that all black inmates posed a security risk is precisely the kind of generalization that Richardson found insufficient to demonstrate narrow tailoring at the summary judgment stage.  Richardson, 594 F.3d at 671.

Accordingly, defendants' motion for summary judgment as to Rhinehart's equal protection claim in KVSP is DENIED.

Defendants also argue that they are entitled to qualified immunity.  The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The threshold question in qualified immunity analysis is: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional

right?" <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  A court considering a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of an actual constitutional right and whether such right was "clearly established." <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009).  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  <u>Saucier</u>, 533 U.S. at 202.

The law that racial classifications are evaluated under strict scrutiny was clearly established in 2005.  <u>Johnson</u>, 543 U.S. at 505.  However, whether defendants' actions were reasonable depends on disputed factual issues regarding whether defendants' actions were narrowly tailored.  Thus, summary judgment is not appropriate.  See <u>Santos v. Gates</u>, 287 F.3d 846, 855 n.12 (9th Cir. 2002).  Accordingly, defendants are not entitled to summary judgment based on qualified immunity.

b.     <u>SVSP</u>

Here, the undisputed evidence shows that, on May 27, 2010, a riot between Northern Hispanic and black inmates occurred on Facility C's exercise yard.  (Decl. Hatton ¶ 7.)  On June 23, 2010, a riot involving 26 inmates with weapons occurred between black and Northern Hispanic inmates on Facility B.  (<u>Id.</u> ¶ 8.)  The inmates involved black inmates of different gang affiliations.  (<u>Id.</u>)  As a result, all Facility B inmates were placed on modified programming pending investigation.  (<u>Id.</u>)  The following day, Northern Hispanic and black inmates rioted on Facility E, which housed the minimum-security inmates who were least likely to engage in physical violence.  (<u>Id.</u> ¶ 9.)  Within the next week, two black inmates attacked another black inmate in Facility B for not participating in the previous racial riot.  (<u>Id.</u> ¶ 10.)  Investigation revealed that there were rising tensions between the Northern Hispanic and black inmates, and that Northern Hispanic inmates were under orders to attack black inmates on sight.  (<u>Id.</u> ¶¶ 11-13.)

14

After prison officials determined that the tension appeared to be limited to Northern Hispanic and black inmates, all other inmates were returned to normal programming.  (Id. ¶ 13.)  Prison officials learned that Northern Hispanic inmates were ordered to attack any black inmate they saw, including non-affiliated black inmates.  (Id. ¶ 14.)  Further, black inmates – including non-affiliated black inmates – were being coerced into participating in the racial conflict.  (Id.)  Two attempted gradual re-integration processes failed, resulting in injuries.  (Id. ¶¶ 18019, 24-26.)  By November 3, 2010, prison officials returned all black inmates to normal programming, but kept Northern Hispanic inmates on modified programming because Northern Hispanic inmates appeared to still be willing to engage in violence upon black inmates.  (Id. ¶ 27.)

Similar to Hurd and Larry, at SVSP, following a racial riot, prison officials first placed the entire facility on modified programming.  Investigation revealed that all black inmates were either going to participate in the racial tension, or be attacked for failing to participate.  Further, investigation revealed that Northern Hispanic inmates were directed to attack any black inmate on sight, regardless of affiliation.  Thus, under these undisputed facts, "reasonable men and women could not differ regarding the necessity of a racial classification in response to prison disturbances and that the racial classification was the least restrictive alternative (i.e., that any race-based policies are narrowly tailored to legitimate prison goals)."  Richardson, 594 F.3d at 671.

Accordingly, defendants' motion for summary judgment as to Rhinehart's equal protection claim in SVSP is GRANTED.[4]

### 3.    Eighth Amendment - Outdoor Exercise

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones.  See Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The treatment a prisoner

---

[4] Because the Court grants defendants' motion for summary judgment as to SVSP, it is unnecessary to discuss whether defendants are entitled to qualified immunity.

receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993).  A prison official violates the Eighth Amendment when two requirements are met: (1) the inmate was deprived of something "sufficiently serious," see Foster v. Runnels, 554 F.3d 807, 812 (9th Cir. 2009), and (2) the prison official was subjectively aware of a serious risk of substantial harm, see Thomas v. Ponder, 611 F.3d 1144, 1151 n.5 (9th Cir. 2010).

Exercise is one of the basic human necessities protected by the Eighth Amendment.  See LeMaire v. Maass, 12 F.3d 1444, 1457 (9th Cir. 1993).  Some form of regular exercise, including outdoor exercise, "is extremely important to the psychological and physical well-being" of prisoners.  See Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979).  Prison officials therefore may not deprive prisoners of regular exercise.  See Toussaint v. McCarthy, 597 F. Supp. 1388, 1393 (N.D. Cal. 1984).  Although the Ninth Circuit did not specify the "minimum amount of weekly exercise that must be afforded to detainees who spend the bulk of their time inside their cells," the court held that ninety minutes per week of exercise, which is the equivalent of slightly less than thirteen minutes a day, does not comport with Eighth Amendment standards.  Pierce v. County of Orange, 526 F.3d 1190, 1212 (9th. Cir. 2008).

Rhinehart asserts that he was deprived of outdoor exercise between May 26, 2009, and June 28, 2009, and again from May 27, 2010, through July 8, 2010, at KVSP, totaling approximately 10 weeks.  Rhinehart also claims that he was deprived of outdoor exercise between July 8, 2010, and November 3, 2010, at SVSP, totaling approximately four months.  Defendants argue that they are entitled to summary judgment on the merits, as well as on grounds of qualified immunity.  Because the Court agrees that defendants are entitled to qualified immunity, it will only address that argument below.

The qualified immunity inquiry is separate from the constitutional inquiry for a claim of

16

deliberate indifference under the Eighth Amendment.  Estate of Ford v. Caden, 301 F.3d 1043, 1053 (9th Cir. 2002).  A determination that there is a triable issue of fact as to whether defendants were deliberately indifferent does not necessarily preclude a finding of qualified immunity.  Id.

For a qualified immunity analysis, the court need not determine whether the facts alleged show that defendants acted with deliberate indifference.  See Osolinski v. Kane, 92 F.3d 934, 936 (9th Cir. 1996).  Rather, the court need only review the relevant law to determine whether, in light of clearly established principles at the time of the incident, the officials could have reasonably believed their conduct was lawful.  See id. at 939 (granting qualified immunity on Eighth Amendment safety claim because reasonable prison official could have reasonably believed that defendants' conduct, as alleged, did not violate Eighth Amendment); see also Norwood v. Vance, 591 F.3d 1062, 1068-70 (9th Cir. 2010) (finding defendants were entitled to qualified immunity for deprivation of outdoor exercise during four extended lockdowns over the course of two years because reasonable officer could have believed that restricting plaintiff's outdoor exercise in the midst of ongoing prison violence was consistent with the 8th Amendment).

At the time of the events at issue here, it was not clear under existing legal authority whether the Constitution prohibited the actions taken by both the KVSP and SVSP defendants. The Ninth Circuit had recognized that prolonged deprivations of outdoor exercise, when combined with other serious deprivations, may give rise to an Eighth Amendment claim.  See Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979) (holding that the "cumulative impact" of "several factors," including continuous segregation, "meager out-of-cell movements," "minimal" contact with other persons, and an "atmosphere of fear and apprehension" for a period of years rendered some amount of outdoor exercise constitutionally necessary) (internal quotation marks omitted). However, the Ninth Circuit has also concluded that the deprivation of outdoor exercise for long-periods of time does not offend the Eighth Amendment when curtailment of such privileges are

necessary to prison security.  See LeMaire, 12 F.3d at 1458.

    In Norwood, the plaintiff was denied outdoor exercise during four separate periods, for a total of two years spanning 2002 through 2003.  591 F.3d at 1065.  The prison instituted these lockdowns after several inmate attacks upon officers or upon other inmates.  Id.  It was undisputed that the plaintiff was not involved in any of these incidents.  Id.  The Ninth Circuit granted defendants qualified immunity.  The court recognized that the dispositive inquiry was whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. at 1068.  The court further recognized that prison officials have a duty to keep inmates safe and must balance that responsibility against other obligations that are mandated, such as outdoor exercise.  Id. at 1069.  "When violence rises to unusually high levels, prison officials can reasonably believe it is lawful to temporarily restrict outdoor exercise to help bring the violence under control."  Id.  Importantly, it matters not whether the measures were effective, but whether prison officials reasonably believed that the measures would be effective.  See id.  The court also concluded that prison officials' judgment was reasonable in concluding that permitting outdoor exercise carried a greater risk of harm than denying outdoor exercise for extended periods of time.  Id. at 1070.  Finally, the court mentioned several California district court cases which have similar fact patterns to Rhinehart's in support of the fact that no authority has clearly established a contrary conclusion that a reasonable officer could believe that restricting an inmate's outdoor exercise was inconsistent with the Eighth Amendment.  Id. ("Not surprisingly, our district courts have found an absence of Eighth Amendment liability on facts similar to these.  See, e.g., Jones v. Garcia, 430 F. Supp. 2d 1095, 1102-03 (S.D. Cal. 2006) (finding no Eighth Amendment violation where prisoner was denied outdoor exercise for ten months -- double the longest single period that Norwood's exercise was restricted-because of ongoing violence); Hayes v. Garcia, 461 F. Supp. 2d 1198, 1201, 1207-08 (S.D. Cal. 2006) (same for nine-month denial of

outdoor exercise); <u>Hurd v. Garcia</u>, 454 F. Supp. 2d 1032, 1042-45 (S.D. Cal. 2006) (same for five-month denial).").

At the time of the events at issue, it was not clear under existing legal authority whether the Constitution prohibited the actions taken by defendants.  The cases in which the Ninth Circuit has recognized that prolonged deprivations of outdoor exercise may give rise to constitutional violations, concerned only longer periods of deprivation that were combined with other harsh lockdown conditions.  See <u>Spain</u>, 600 F.2d at 199 (holding that the "cumulative impact" of "several factors," including a denial of outdoor exercise, for a period of years could amount to a constitutional violation); <u>LeMaire</u>, 12 F.3d at 1457-58 (holding that five-year deprivation of outdoor exercise did not violate the Eighth Amendment, where the prisoner was afforded opportunities for indoor exercise).

Accordingly, defendants are entitled to qualified immunity because, given those precedents, they could reasonably have concluded that the conditions they imposed as part of Rhinehart's modified programs did not violate any constitutional right that was "clearly established in light of the specific context of the case at the time of the events in question." <u>Mattos v. Agarano</u>, 661 F.3d 433, 440 (9th Cir. 2011) (internal quotation marks omitted).

### 4. Injunctive Relief

Defendants argue that Rhinehart is no longer incarcerated at KVSP, and thus, Rhinehart's claims against Harrington are moot.[5]  "An inmate's release from prison while his claims are pending generally will moot any claims for injunctive relief relating to the prison's policies unless the suit has been certified as a class action."  <u>Alvarez v. Hill</u>, 667 F.3d 1061, 1064 (9th Cir. 2012).  Moreover, Harrington is no longer the Warden of KVSP and cannot provide the injunctive relief

---

[5] The Court has granted summary judgment to Cate, and granted summary judgment on claims involving SVSP, which terminates Hedgpeth from this action.  Thus, Harrington is the remaining defendant.

United States District Court
Northern District of California

that Rhinehart seeks.  Cf. Pride v. Correa, 719 F.3d 1130, 1138 (9th Cir. 2013).  Thus, Rhinehart's claim for injunctive relief must be DISMISSED as moot as to Harrington.

**CONCLUSION**

For the foregoing reasons, the Court orders as follows:

1.  Defendants' motion to strike supplementary exhibits is GRANTED.  Defendants' motion for summary judgment is GRANTED as to Cate.  Defendants' motion for summary judgment is GRANTED as to Rhinehart's equal protection claim against Hedgpeth.  Defendants' motion for summary judgment is DENIED as to Rhinehart's equal protection claim against Harrington.  Defendants' motion for qualified immunity is GRANTED as to Rhinehart's Eighth Amendment claim against Harrington and Hedgpeth.  Rhinehart's request for injunctive relief against Harrington is DISMISSED as moot.

2.  The case is hereby REFERRED to Magistrate Judge Nandor Vadas for settlement proceedings.  Such proceedings shall take place within 120 days of the date this order is filed, or as soon thereafter as Magistrate Judge Vadas's calendar will permit.  Magistrate Judge Vadas shall coordinate a place, time and date for one or more settlement conferences with all interested parties and/or their representatives and, within fifteen days of the conclusion of all settlement proceedings, shall file with the Court a report thereon.  The Clerk is directed to serve Magistrate Judge Vadas with a copy of this order and to notify Magistrate Judge Vadas that a copy of the Court file can be retrieved from the Court's electronic filing database.

/ / /

/ / /

/ / /

/ / /

/ / /

3.  In view of the referral, further proceedings in this case are hereby STAYED and the case is ADMINISTRATIVELY CLOSED.  If the case is not settled, the Court will enter a new scheduling order for further proceedings.

**IT IS SO ORDERED**.

Dated:  February 12, 2014



JON S. TIGAR
United States District Judg

21